**FAIRFIELD S. S. CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.**

No. 222, Docket 20115.

Circuit Court of Appeals, Second Circuit.
June 21, 1946.

Additional Opinion Aug. 9, 1946.
Writ of Certiorari Denied Nov. 12, 1946.
See 67 S.Ct. 193.

Frank V. Barns, of New York City (Winthrop O. Cook, of New York City, of counsel), for petitioner.

Harry Baum, of Washington, D. C., Sewall Key, Acting Asst. Atty. Gen., and Helen R. Carloss, Sp. Asst. to Atty. Gen., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This is a petition to review an order of the Tax Court, affirming a deficiency assessment against the Fairfield Steamship Company, based upon a gain "realized" upon the sale of a ship in 1940. The Fairfield Company was a corporation, all of whose shares were owned by another corporation, the Atlantic Coast Shipping Company, and the validity of the assessment turns upon which of the two companies made the sale. Concededly the Fairfield Company owned the ship and transferred it to the Atlantic Company, which sold it to a third party; if the transfer to the Atlantic Company was a distribution in liquidation of the Fairfield Company under § 112(b) (6) (C) or (D), it did not result in any gain "recognizable" against the Fairfield Company; the gain was postponed, and was "realized" only when the Atlantic Company itself sold to the third person. The importance of the difference

lies in the fact that the Atlantic Company had losses which it could offset against the gain. The relevant facts were as follows. The shares of the Atlantic Company were all held by three persons: 51% by one, Lewis, 39% by Lewis and Barns, as executors of Lewis's father; 10% by a Mrs. Dennis. The directors were Lewis, Barns and a woman, named Logan, whose relation to the company does not appear. The directors of the Fairfield Company were these three persons and two more, whose relation to that company also does not appear. The three shareholders of the Atlantic Company in the summer of 1940, and even earlier, had agreed upon a liquidation of that company and of the Fairfield Company at the same time. However, it was from the first intended that the ship would be sold by the Atlantic Company after title to it had passed upon the liquidation of the Fairfield Company; that being a method which would save taxes. Lewis employed one, Pendleton, and Lambert, a ship broker, and after a good deal of negotiation Lambert got an offer of $50 a ton on September 18, 1940, which was satisfactory to Lewis. Lambert did not know for whom he was working, but Pendleton did, and Lewis meant the Atlantic Company to be the seller, as we have just said. The actual transfer was made as follows. On September 19, 1940, the three shareholders of the Atlantic Company authorized that company, as sole shareholder of the Fairfield Company, to execute and file a dissolution certificate of the Fairfield Company, and to surrender the shares which it held in that company in exchange for the ship and all the Fairfield Company's other property. On the same day the shareholders of the Fairfield Company ("represented" by Lewis alone, as president of that company) held a meeting and voted to dissolve and to make the transfer. Thereafter, still on the same day, the three shareholders of the Atlantic Company reconvened and authorized Lewis to sell the ship for the price mentioned. The Fairfield Company transferred title to the ship to the Atlantic Company on the 23rd, and the Atlantic Company made a formal contract of sale with the purchaser on the 30th, and actually transferred her on October

3rd. The Fairfield Company did not transfer the rest of its property—more than $107,000—to the Atlantic Company until December 27.

A majority of the Tax Court thought, because the negotiations had been concluded by a satisfactory offer before the Fairfield Company transferred the ship, that the sale was to be imputed to that company. They did not hold and indeed they could not properly have held, that as matter of fact the shareholders of the Atlantic Company ever meant the Fairfield Company to sell the ship; on the contrary the shareholders had most carefully provided the contrary. Thus, so far as the transaction depended upon the actual intent of the only parties who could have any intent, it is impossible to find support in the record for a finding that the Fairfield Company made the sale; and if that was the legal result of what they did, it was imposed upon the transaction in spite of their intent. The case is further complicated by the fact that the majority relied for their decision upon an interpretation of Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, to which we cannot agree. On the contrary we think that the minority were right in believing that that case turned upon the fact that all the preliminary negotiations had been made expressly with the corporation; and that it was only after the bargain had been struck, that the device of a liquidation was brought in as deus ex machina. The contrary was true here.

 Notwithstanding the extremely limited scope of our powers to disturb any decision of the Tax Court, we should feel somewhat embarrassed by these circumstances, were it not that we think the majority's decision right, regardless of whether the shareholders of the Atlantic Company always intended that that company should sell the ship. We think that her transfer to the Atlantic Company on September 23, resulted in a gain taxable against the Fairfield Company, because it was neither a "distribution" "in complete cancellation or redemption of all its stock" under § 112(b) (6) (C), nor "one of a series of distributions" under § 112(b) (6)

(D). Section 112, as a whole, provides for the suspension of what would otherwise be immediately "realized" gains or losses; it has its reason and its justification in the fact that the excepted transfers are of a kind which do not result in substantial changes of interest, and that the original business is to go along as before. The situation seems to be like that in Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355, where although the taxpayer followed step by step the provisions of the statute, and was therefore literally entitled to escape, the Supreme Court held that the section must be interpreted in the light of its purpose, and not merely as a verbal mosaic. The question there was whether, when Congress used the word, "corporation," it meant to include corporations which had not been organized for ordinary business purposes, but only to escape taxes. That did not make relevant the taxpayer's motive to escape taxation; it merely held that the statute should be read in the light of its own purpose. Similarly in the case at bar as to § 112(b) (6) (C) or (D). As we have just said, the underlying purpose was to permit the union in one corporate form of a single business or venture which had theretofore been managed by two corporations—the transferee holding all the shares of the transferror. That was the condition of relief from what would otherwise be a "realized" gain, and it presupposed that the persons actually interested —the single set of shareholders—meant to go on with the venture, and had not already decided that it should be wound up. That does not of course mean that the property acquired by a liquidation cannot be sold later without imperilling the privilege; it will be subject to disposal in the hands of the parent as it would have been, had the business gone on as before under both corporations. But it does mean that the privilege assumes that the business shall continue and that the liquidation shall not be merely a step in winding it up. That was, however, exactly the misuse to which the parties here tried to put the words of the section, and it should not succeed.

Order affirmed.

## Addendum.

Our statement that the transfer of the ship to the Atlantic Company "resulted in a taxable gain against the Fairfield Company" because it was not within § 112(b) (6) (C) or § 112(b) (6) (D), was elliptical and may cause confusion. All complete liquidations effect a dissolution of the corporation, although all dissolutions are not liquidations within the meaning of § 112 (b). Although for the reasons we gave, the transfer of the ship, followed in December by a transfer of other assets, was not a "liquidation," it nevertheless completed a dissolution of the Fairfield Company; and in such cases "the corporate existence is continued for the purpose of liquidating the assets and paying the debts." The Atlantic Company, which occupied the position of receivers or trustees in dissolution, stood "in the stead of the corporation for such purposes. * * * Any sales of property by them are to be treated as if made by the corporation for the purposes of ascertaining the gain or loss." Regulations 103, § 19.22–(a) 21.